IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**UNITED STATES OF AMERICA**,

v.

**BRENT BROWN**,
    *Defendant.*

Case No 3:22-CR-1-WWB-JBT

**SENTENCING MEMORANDUM**

Defendant BRENT BROWN submits this memorandum to assist the Court in preparation for the sentencing scheduled for **2:00p** on **April 9, 2024**.

On January 11, 2024, Defendant entered a plea of guilty to one count of failing to pay over to the Internal Revenue Service payroll taxes on employees' wages, in violation of 26 U.S.C. § 7202. [Doc. 55]

This memo seeks to show why a below-Guidelines sentence would be "sufficient but not greater than necessary" to fully meet the purposes of 18 U.S.C.A. § 3553(a). [1]

---

[1] Courts typically review the PSR in light of any unresolved objections, determine the Guidelines range under §3553(a)(4), consider arguments for departures, and then examine each of the other §3553(a) factors as a basis for variance. This memorandum will track that approach.

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.
>
> *Koon v. United States*, 518 U.S. 81, 113 (1996).

## PSR ADVISORY GUIDELINES RANGE

The final PSR, using the 2023 Guidelines Manual and amendments, is calculates a Total Offense Level of 19, which, with the calculated criminal history (CH I), results in an advisory Guidelines range of 30-37 months. PSR ¶¶ 30, 34, 61.

## CONSIDERATION OF § 3353(a) FACTORS

### (1) Circumstances and Characteristics

Under 18 U.S.C. § 3553(a)(1), a sentencing court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant."

*History and characteristics of the defendant*

Brent Brown was born in Omaha, Nebraska. His family, including his parents and older brother, moved several times due to his father's employment in the retail industry for various department stores. He estimates their family moved ten times before he was in sixth grade, with stops mostly in the Midwest, including Columbus, Cincinnati, and Lexington. The family moved once or twice a year before settling in Pittsburgh, Pennsylvania in the middle of his sixth grade year.

2

Brent grew up in a difficult home environment. His father seemed never present, and Brent felt he did not really have his father's guidance or support. His mother was a secretary for an energy company and tried to offer compassion as she dealt with an absent husband. Brent witnessed his parents' disjointed relationship yet tried to persevere, though he never looked at his father and mother as "husband and wife." (His parents would divorce sometime after Mr. Brown graduated high school.) Brent compensated for these adversities by focusing on academics and participating in athletics.

Brent excelled in academics and athletics. He was a straight A student, and played several sports in high school, but eventually focused on football. He was the school's quarterback and had a passion for the sport. Heavily recruited by various colleges, he had his heart set on attending a military academy. He had received congressional recommendations to attend both the U.S. Military Academy and the U.S. Naval Academy, but after visiting Annapolis, Maryland, he had no doubt he wanted to attend the U.S. Naval Academy.

In 1983, Brent had met Antonia Zambrano after his high school played football against the rival school she attended. Theirs was a story of true high school sweethearts, and in the Zambranos Brent saw a model of family life that he had

not previously experienced. Antonia supported Brent's plans and goals and they had plans to marry after he had graduated from the Naval Academy.

The U.S. Naval Academy was a challenge for Mr. Brown. He had not known anyone in the military and in retrospect did not really know what he was getting himself into. While he enjoyed the daily regimen, the Academy was rigorous. Mr. Brown endured and his time at the Academy truly shaped him into the man he is today. He was on the football team and was very disciplined with practice and participation as a midshipman.

Unfortunately, just prior to his sophomore year, Mr. Brown tore his rotator cuff and his hope of playing football in college came to an end. He had to come to terms with the fact that he would no longer play the sport he grew up loving. While this could have been a devastating blow, Mr. Brown overcame the negativity and found a new perspective. He tried out for and joined the varsity karate team at the U.S. Naval Academy. He traveled with the team competing with other colleges across the country. Mr. Brown seemed to be able to adapt and flourish when faced with adversity.

Mr. Brown graduated from the U.S. Naval Academy in 1991, having qualified for several billets, including Naval Aviation and the Seals (each of which

were very selective). Mr. Brown chose Naval Aviation and received orders to NAS Jacksonville. He arrived just following the close of the First Gulf War (with military spending in sharp decline). He found himself on a two-year wait to get into flight school in Pensacola, Florida. Mr. Brown saw his military career head down a path he was not sure he wanted to take. When the Navy offered Mr. Brown an "early out," he recognized the opportunity and pivoted on his career path.

After the Navy, Mr. Brown explored different business fields to see where he could best utilize his talents and skills in shaping a new career and future. He began in investment banking, working for several companies, and learning a completely new way of life in the civilian world. In 2003, Mr. Brown shifted slightly and focused on real estate. He would purchase, improve, and sell properties. This path seemed promising until the real estate market crashed. Mr. Brown again had to endure difficulties and setbacks as he continued to try and build a future for himself and his family.

Brown has three children, a son (25), and two daughters (23 and 17). He has tried to be an active parent in the lives of his children. He coached their sports teams and always supported their interests. Even now as they are older, Mr. Brown does everything he can to ensure his children have opportunities in life to

succeed in whatever path they choose. In 2008, Mr. Brown took a risk and started developing the Latitude brand. He signed a lease for a newly vacant property with the idea of turning it into a restaurant and entertainment complex. He dedicated his time and energy to building this concept.

The character letters[2] give insight into the kind of person Mr. Brown is, showing a man who is more than his business failure and legal issues, uniformly praising him for his work ethic and commitment to his family. One person he worked with closely as a consultant says, "Brent is the most family first, team first, trust first, person I have ever met." Letter of PB. That individual describes more than one instance in which Brent served as a mentor or even a father figure to him.

Mr. Brown's family finds him to be "stable, trusted, and dependable," even in the aftermath of the failure of Latitude. Letter of SZ. His family is as important to him as ever and each member leans on Mr. Brown for support and guidance. His wife says, "We admire how Brent has handled the challenges we faced as a family over the past 8 years since Latitude closed." His mother-in-law explains

> Brent's family is important to him. He is always involved with his kids at school and the after school activities. He supports them in any path they choose to follow. Brent knew how

---

[2] The letter writers are referred to by their initials in this memorandum. Their full information is in the packet submitted to Probation on April 2.

> important family was through his upbringing and sharing time with our family. This made him very family oriented.

The letter writers also respect Mr. Brown's selflessness and compassion in his business dealings:

> Brent is not the behind-the-scenes employer. He recognizes and acknowledges employees. He has been known to go beyond conventional acts of kindness and has created a culture of kindness for his employees by not only supporting them at work but also helping them with growth.

Letter of AZ. Another describes Mr. Brown as "an extremely generous man" who has "always wanted those who have worked for or with him to share in any of the successes he may have had." Letter of RW. A long-time friend and colleague has "witnessed Brent give people second and third chances even when they were not warranted." Letter of DH. Another, RC, has "witnessed Brent go above and beyond for others around him." He is "always willing to help and invest in those who want to better themselves." Letter of BZ.

"Brent always set high standards for himself and leads by example." Letter of BA. Those who know him best are "proud to have Brent as a mentor" and believe he will "work hard" and have no doubt he will be "an asset to the community in whatever endeavors he chooses." Letters of RF, RS. One letter writer, BA, states that Mr. Brown has "shown through the years to be trustworthy, consistent, and just a good human being." Mr. Brown is seen as "a good person"

7

with "morality in his actions" with a "high degree of integrity, responsibility, and ambition." Letter of AZ.

The "nature and circumstances of the offense and the history and characteristics of the defendant" suggest that a below-Guidelines sentence would certainly be "sufficient but not greater than necessary" to meet the purposes of 18 U.S.C. § 3553(a).

*The nature and circumstances of the offense*

The nature and circumstances of the present offense are not dissimilar from most violations of 26 U.S.C. § 7202, where the crime is failing to pay payroll taxes to the Internal Revenue Service. A company takes off quickly, grows too fast, and suffers business problems which leads to the criminal diversion of funds legally due the IRS. Unable to make up the shortfall or pull out of the financial death spiral, the company fails, leaving a legacy of debt and broken promises—and occasionally a looming federal prosecution.

Latitude, a restaurant-family entertainment entity, began in hope at the end of the 2008 recession, mainly with private investors, and expanded from one venue (Jacksonville) to four (adding Indianapolis, Pittsburgh and Albany), with still

others planned.[3] The company then "went public" via a reverse merger in May 2014 with all the oversight and regulation that entailed.[4]

Latitude was already deep in debt.[5] The company's 2Q2015 10-Q filing[6] showed total liabilities of $88,496,363, against assets of $56,015,667, and bluntly stated:

---

[3] PSR ¶ 8. In mid-2013 the Latitude Board of Directors voted to secure financing through private placement financing and a public offering.

[4] *See* Latitude 360, Inc., Form 10-Q for 1Q2015 (filed May 20, 2015) (https://www.sec.gov/Archives/edgar/data/1376755/000114420415032672/v410335_10q.htm)

> On May 30, 2014 the Company completed its acquisition of Latitude 360, Inc., a Florida corporation . . . pursuant to the [Merger Agreement] dated April 8, 2014, among the Company, Latitude Global Acquisition Corp., a Florida corporation and a wholly-owned subsidiary of the Company (the "Merger Sub"), and L360. Pursuant to the Merger Agreement, on May 30, 2014, Merger Sub merged with and into L360, and L360 became a wholly-owned subsidiary of the Company (the "Merger"). The Company changed its name to Latitude 360, Inc. on January 28, 2014.

*See also, e.g.*, Agreement and Plan of Merger (per Latitude 360, Inc., Form 8-K, Ex. 10.1 (filed April 9, 2014) (https://www.sec.gov/Archives/edgar/data/1376755/000112178114000081/0001121781-14-000081-index.htm)) and amendment ((per Latitude 360, Inc., Form 8-K, Ex. 10.1 (filed May 5, 2014) (https://www.sec.gov/Archives/edgar/data/1376755/000112178114000112/0001121781-14-00 0112-index.htm)).

[5] In December 2014, Mr. Brown received letters from the IRS concerning the proposed assessment of Trust Fund Recovery Penalties against him personally on the unpaid 2013 and 2014 taxes of various Latitude entities.

[6] Latitude 360, Inc. Form 10-Q (filed 08/20/2015) (https://www.sec.gov/Archives/edgar/data/1376755/000163387115000084/latx20150630_10q.htm).

9

**2. LIQUIDITY AND GOING CONCERN**

<u>The Company has incurred significant losses from operations during the six months ended June 30, 2015 and the year ended December 31, 2014, and as of June 30, 2015 has a retained deficit of $174,628,145</u>. As of June 30, 2015, the Company has a working capital deficit of $88,105,182. Notes payable and bank debt with a face value of $15,270,131 was in default, as of June 30, 2015. Capital lease obligations of $20,988,280 were in default as of June 30, 2015. <u>The Company is delinquent in the payment and filing of certain of its 2013, 2014 and 2015 payroll tax liabilities with the Internal Revenue Services and other state and local taxing authorizes. As of June 30, 2015, unpaid payroll taxes total approximately $4,870,462 and related penalties and interest total approximately $821,428.</u> These liabilities have been recorded within accrued expenses on the balance sheet at June 30, 2015. As of December 31, 2014, unpaid payroll taxes total approximately $2,981,085 and related penalties and interest total approximately $160,927. These liabilities have been recorded within accrued expenses on the balance sheet at December 31, 2014. The Company has hired a consultant to assist in the completion of the filings and expects to have an agreement in place to pay these amounts as soon as possible. Based on the results of a review of these tax filings, <u>the Company may be subject to additional interest and penalties by the taxing authorities if such amounts are not forthcoming</u>.

The Company's ability to continue its operations and to pay its obligations when they become due is contingent upon obtaining additional financing and generating positive cash flows from its operations. Management's plans include seeking to procure additional funds through debt and equity financings and to increase operating cash flows from revenues expected to be generated from the operation of new venues.

The company has been actively seeking a combination of funding and is currently in discussions with several potential financing sources in regards to raising equity, bridge funding, balance sheet funding and/or equipment financing that management believes that, if obtained, will ultimately

> improve the Company's liquidity and provide the capital necessary to fund the Company's growth plans.
>
> There are no assurances that the Company will be able to raise capital on terms acceptable to the Company or at all, or that cash flow generated from its venues will be sufficient to meet its current operating costs and required debt service. If the Company is unable to obtain sufficient amounts of additional capital, it may be required to reduce the scope of its planned development, which could harm its financial condition and operating results, or it may not be able to continue to fund its ongoing operations. <u>These conditions raise substantial doubts about the Company's ability to continue as a going concern</u>. These financial statements do not include any adjustments that might result from the outcome of these uncertainties.

*Id.* at 5 (emphasis added).

The additional attempts to raise capital were unsuccessful, As is evident from later SEC filings, Latitude's financial health continued to deteriorate,[7] and

---

[7] *See, e.g.*, Latitude 360, Inc., Form NT 10-Q for 2Q2015 (filed Aug. 14, 2015) (https://www.sec.gov/Archives/edgar/data/1376755/000163387115000062/0001633871-15-000062-index.htm):

> [Latitude] has limited cash resources and liquidity, and has been exploring various alternatives on how to fund working capital needs and institute cost reduction efforts. [Latitude's] current lack of sufficient cash resources, lack of financing, delays in shipments of certain products coupled with the corresponding delays in receipt of expected revenue from the sale of such products, and the imposition of stricter payment terms from certain of its suppliers, continue to constrain [its] liquidity and operations. In January 2015, [Latitude's] Chief Financial Officer resigned, and [Latitude's] Chief Executive Officer currently acts as [its] principal financial officer.

within about six months Latitude's last remaining venue (Pittsburgh) was forced to close its doors.[8]

The loss of income due to the close of operations increased the debt and tax problems, and the company was placed into involuntary bankruptcy by its creditors in 2017.[9] A Chapter 11 Trustee was appointed on January 20, 2017, and a Chapter 11 Plan of Liquidation was filed on January 25, 2019 and confirmed on December 23, 2019. The case was ultimately closed in mid-2020, with the IRS receiving over $850,000 dollars under the Plan.

Mr. Brown was eventually indicted on January 5, 2022. [Doc. 1] The 17 counts of the indictment covered the period 2015-2016. As CEO, he was deemed a

---

[8] The problems had been further exacerbated by a motor vehicle accident in which Mr. Brown (now functioning as principal financial officer) sustained serious injuries which required him to take a medical leave of absence. *See* PSR ¶ 48; *see also* Latitude 360, Inc., Form 8-K (filed Sept. 9, 2015) (https://www.sec.gov/Archives/edgar/data/1376755/000163387115000103/0001633 871-15-000103-index.htm):

> Effective Sept 7, 2015, Brent Brown, the Company's Chief Executive Officer, has taken a medical leave of absence for surgery and to recover from injuries due to an automobile accident. The day-to-day duties will be assumed by the Chief Financial Officer, President and Treasurer of the Company during this time that is expected to last four to six weeks.

In the event, he would not return to his duties through the end of 2015.

[9] *In re Latitude 360, Inc.*, Case No. 3:17-bk-00086-JAF (MD FL Bkr.).

"responsible person" for purposes of 26 U.S.C. § 7202, "that is, he had the corporate responsibility to collect and pay over payroll taxes on behalf of Latitude 360 and the Latitude Subsidiaries." *Id.* ¶ 5. Mr. Brown's status as responsible party was confirmed by his 2016 affidavit agreeing that he was the sole person responsible for Latitude's failure to pay the sums.[10]

>The indictment alleged:

>>The defendant caused each of the Latitude Subsidiaries to file an Employer's Quarterly Federal Income Tax Return (Form 941) for each quarter accurately reflecting the payroll taxes due for the quarter but the defendant failed to pay over and caused each of the Latitude Subsidiaries to fail to pay over the full payroll taxes due as reflected in the tax returns.

*Id.* ¶ 6. The unpaid quarterly totals for each location were alleged to range from $173,288 (2Q2015, Jacksonville) to $209 (4Q2015, Albany). The total alleged due and unpaid was $1,175,177. *See id*. Mr. Brown accepted responsibility for the non-payment of these amounts and pleaded guilty to Count Thirteen of the Indictment,

---

[10] The affidavit, attached as Exhibit A, was requested by Latitude's accounting consultant, and stated in part

>4. As CEO I determined that, in order for the company to continue in operation it, for a period of time, would be unable to pay the IRS payroll trust fund taxes. This decision was made based on the expectation that investment capital would be raised sufficient to pay the delinquent IRS payroll tax liabilities.

Exhibit A includes the email string between Mr. Brown and the consultant.

agreeing to $3,832,360.48 in restitution.[11] [Doc. 55] At no point did Mr. Brown attempt to evade responsibility for the offense.

For these reasons and under these circumstances, a below-Guidelines sentence would be "sufficient but not greater than necessary" to meet the purposes of 18 U.S.C.A. § 3553(a).

### (2) Respect for the Law, Deterrence, Public Safety, Rehabilitation

Under § 3553(a)(2), the sentencing court must also consider

> the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

The present case is somewhat unusual in that Mr. Brown accepted full responsibility for the non-payment of the taxes in an affidavit prepared in early 2016 (well before the 2022 indictment). He has since endured severe legal con-

---

[11] As explained in the Plea Agreement, Mr. Brown agreed to restitution of $3,832,360.48, which included amounts attributable to uncharged conduct from prior to 2015 ($333,374.00), tax liability of the pre-merger entities ($1,536,375.48), and the employer's portion of FICA for uncharged conduct ($175,950.00) and charged conduct ($611,484.00). [Doc. 55]

sequences including the involuntary bankruptcy, numerous civil suits and a related State sales tax investigation.

Since the demise of the Latitude entities in 2016, Mr. Brown and his family have endured the full measure of negative publicity for a business failure which affected many employees and investors. The personal fallout has been extensive. He has been under supervision since his arrest in 2022. During that period, Mr. Brown has acted responsibly and obeyed all court orders. *See* PSR ¶7.

For these reasons, a below-Guidelines sentence would be "sufficient but not greater than necessary" to meet the purposes of 18 U.S.C.A. § 3553(a).

### (3) Available Sentences

Under § 3553(a)(3), the sentencing court must also consider "the kinds of sentences available." In this case, because of the non-violent nature of the crime, the fact that the Defendant has taken full responsibility for the offense, and the fact that he has voluntarily taken on responsibility for $3.8M in restitution, consideration of alternative sentences seems particularly appropriate.[12]

---

[12] The restitution total would have been limited to the trust fund portions of the quarters indicted ($1,175,177) but for the terms of the agreement itself. *See* "Chapter 9: Willful Failure to Collect or Pay Over Tax (26 U.S.C. § 7202)," at 4, United States Department of Justice Criminal Tax Manual (2024) ("Prosecutors should remember that restitution ordered on account of a defendant's § 7202 convictions must be limited to not only the quarters of conviction but also the trust fund portion of a specific quarter, unless the defendant agrees to pay restitution in the

15

The Supreme Court has long rejected the idea that even a non-custodial sentence is necessarily "lenient." *See Gall v. United States*, 552 U.S. 38, 48 (2007) (upholding sentence of probation where PSR had calculated sentencing range under advisory Guidelines of 30-37 months). *See also, e.g., United States v. Del Campo*, 695 F. App'x 453, 458 (11th Cir. 2017) (as against an advisory guideline range of 46-57 months, even a non-custodial sentence not substantively unreasonable where district court shows its reasoning under 18 U.S.C. § 3553(a)).

In the present matter, a below-Guidelines sentence would fully meet the goals of 18 U.S.C. § 3553(a).

### (5) Sentencing Policy

Under § 3553(a)(5), the sentencing court should consider "any pertinent policy statement" issued by the Sentencing Commission (or otherwise in effect). Undersigned counsel is aware of no such policy statements.

### (6) Avoiding Disparities

Under § 3553(a)(6), the sentencing court must also consider "the need to avoid unwarranted sentence disparities" among similarly situated defendants.

---

amount of the relevant conduct tax loss.") (https://www.justice.gov/tax/foia-library/criminal-tax-manual-title-page-0).

We compare the PSR Guidelines range to United States Sentencing Commission data concerning actual sentences for defendants nationwide.[13] The results suggest that the Guideline range of 30-37 months is considerably higher than the sentences actually given to similarly-situated defendants across the country:

| PSR TOOL | Tax OFFENSE | §2T1.6 PRIMARY GUIDELINE | 19 FINAL OFFENSE LEVEL | CH I CRIMINAL HISTORY | — N | 30-37 months MEAN (months) | MEDIAN (months) |
|---|---|---|---|---|---|---|---|
| Sourcebook | Tax | All | — | — | 446[14] | 15 | 12 |
| JSIN[15] | Tax | §2T1.6 | 19 | CH I | 30 | 18 | 18 |
| IDA[16] | Tax | §2T1.6 | all | CH I | 56 | 12 | 12 |

In the present case, therefore, the 18 U.S.C. § 3553(a)(6) factor does not weigh against the imposition of a below-Guidelines sentence.

---

[13] *See, e.g.*, U.S.S.C. Sourcebook (www.ussc.gov/research/sourcebook-2023), U.S.S.C. Judicial Sentencing Information Network (jsin.ussc.gov), and U.S.S.C. Interactive Data Analyzer (ida.ussc.gov).

[14] The Sourcebook notes that of 446 individuals sentenced for tax crimes, 157 (35%) received probationary sentences.

[15] The JSIN numbers *exclude* probationary sentences. Thus, from JSIN: "During the last five fiscal years (FY2019-2023), there were 30 defendants whose primary guideline was §2T1.6, with a Final Offense Level of 19 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 28 defendants (93%) who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 18 month(s) and the median length of imprisonment imposed was 18 month(s)."

[16] From the IDA, which includes probationary sentences:

### (7) Restitution

Under § 3553(a)(7), the sentencing court must also consider "the need to provide restitution to any victims of the offense." As the government may concede, the best and probably only substantial source of restitution in the present case will be income from Brown's wife's business, which presently employs him. He will not be able to contribute his labor to it while in prison. In the present case, the 18 U.S.C. § 3553(a)(7) factor may weigh in favor of the imposition of a below-Guidelines sentence.

---

The figure includes the 56 cases reported to the Commission. Cases missing information necessary to complete the analysis were excluded from this figure. Sentences of 470 months or greater (including life) and probation were included in the sentence average computations as 470 months and zero months, respectively. Sentences of probation only are included here as zero months. The information in this figure includes conditions of confinement as described in USSG §5C1.1. FILTER: Fiscal Year: 2023; Circuit: All; State: All; District: All; Race: All; Gender: All; Age: All; Citizenship: All; Education: All; Crime Type: Tax; Guideline: §2T1.6; Drug Type: All; Sentencing Zone: All; Criminal History: I; Career Offender Status: All.

## CONCLUSION

For the reasons stated above, and based on the Plea Agreement, the PSR, and the other materials before the Court, Defendant requests that the Court impose a below-Guidelines sentence.

DATED at Jacksonville, Florida this 2th day of April, 2024.

BEDELL, DITTMAR, DeVAULT, PILLANS & COXE
Professional Association

By:   s/ Henry M. Coxe III
Henry M. Coxe III
Florida Bar No. 155193
*hmc@bedellfirm.com*
Allan F. Brooke II
Florida Bar No. 994413
*afb@bedellfirm.com*
Lidija I. Barauskas
Florida Bar No. 118076
*lib@bedellfirm.com*
101 East Adams Street
Jacksonville, FL 32202
(904) 353-0211
(904) 353-9307 Facsimile

Counsel for Defendant Brent Brown